UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | : | Hon. Joseph H. Rodriguez |
| *Plaintiff*, | : | CRIM NO. 1:96-576 |
| v. | : | **Opinion** |
| MOSES CLARY, | : | |
| *Defendant*. | : | |

Presently before the Court is the motion for compassionate release filed by Defendant Moses Clary ("Clary") [Dkt. 114] and the opposition thereto filed by the United States of America (the "Government") [Dkt. 122] as well as Clary's reply [Dkt. 131]. For the reasons set forth below, the Court will deny Clary's motion.

I.  Background

    a.  Upbringing

Clary endured a tumultuous upbringing. Clary's parents separated when he was five years old and Clary lived periodically with his mother and father. [Dkt. 122 at 3]. New Jersey's Division of Youth and Family Services ("DYFS") repeatedly placed Clary into foster care due to a "chaotic, unstable, grossly abusive, and severely neglectful" home environment. [Dkt. 122 at 3]. For example, Clary's mother was hospitalized for an overdose, and frequently left Clary alone at a motel with no food or supervision. [Dkt. 122 at 3]. Clary's father died of a heart attack when Clary was nine-years old, and Clary's mother committed suicide when he was twelve-years old. [Dkt. 114 at 4]. Clary was left "essentially homeless." [Dkt. 114 at 4].

Clary's adolescent years were characterized by criminal behavior, instability, and mental "deterioration." [Dkt. 114 at 4]. Clary began stealing and met Vincent Reid ("Reid") who

1

employed Clary as a street-level drug dealer. [Dkt. 114 at 4]. Clary's own brother stabbed him in the chest which collapsed his lung. [Dkt. 122 at 4]. Clary also began to experience hallucinations. [Dkt. 114 at 4]. For a time, Clary was admitted to Beta House, a group foster home, where a psychiatrist noted Clary's "bizarre" behavior. [Dkt. 114 at 4]. Clary frequently ran away from Beta House, living on the streets or staying with friends. For approximately two to three years and until he was sixteen- or seventeen-years old, Clary lived in the van of man in his 40's who sexually abused Clary. [Dkt. 114 at 4–5].

Around this time, Clary fell in with a violent, "cultish" street gang. [Dkt. 114 at 5]. Reid and Clary's brother were both members, and Clary believed that Reid was "superhuman" with "supernatural and divine powers … appointed by god to commit robberies." [Dkt. 114 at 5]. Meanwhile, Clary's mental health continued to decline, as he experienced hallucinations and was "extremely psychotic." [Dkt. 114 at 5].

### b. Armored Car Theft, Arrest, Sentencing

When Clary was twenty-one-years old, Reid gave Clary the "mission" of committing a robbery together. [Dkt. 114 at 5]. On August 5, 1996, Clary and Reid traveled to a shopping mall in Deptford, New Jersey to rob a Brooks Armored Car Service guard at gunpoint. [Dkt. 122 at 2]. Clary and Reid waited until the guard, Rudolph Matlack ("Matlack"), left a bank inside the mall to transport money to the armored car outside the mall. [Dkt. 122 at 2]. Clary and Reid began shooting, and both struck Matlack, who suffered serious injuries. [Dkt. 114 at 5–6]. Clary and Reid also shot and killed a seventeen-year-old bystander. [Dkt. 114 at 6; Dkt. 122 at 2]. Another bystander—a fourteen-year-old girl—was shot, likely when Matlack returned fire at Clary and Reid. [Dkt. 122 at 2]. She died two days later. [Dkt. 122 at 2]. Clary and Reid grabbed bags of money that Matlack was transporting, carried them to a stolen getaway vehicle,

and fled the scene. [Dkt. 122 at 2]. Clary was arrested in Brooklyn approximately one year later. [Dkt. 122 at 2].

On September 18, 1998, Clary pleaded guilty to all nine counts of a superseding indictment that charged him with robbery, bank robbery legal use of firearms, first-degree murder, and felony murder under 18 U.S.C. §§ 924(c), 924(j), 1951(a), 2113(a), 2113(d) and 2113(e). [*See* Dkt. 67–69]. In the plea agreement between Clary and the Government, the Government agreed not to seek the death penalty for any of the five death-eligible offenses, and Clary agreed that two of his offenses carried mandatory minimum life sentences. [Dkt. 122 at 3]. Clary initially asserted an insanity defense but withdrew that defense as part of his plea agreement. On May 21, 1999, the Court sentenced Clary to a life sentence without the possibility of parole. [*See* Dkt. 92, 93]. Clary was twenty-three years old at the time. Clary has served more than twenty-three years in prison and is currently housed at Federal Correctional Institution ("FCI") McDowell in Welch, West Virginia. [Dkt. 122 at 3].

c. **Rehabilitation, Hardships During Sentence, and COVID-19**

Clary has made productive use of his time in prison. Despite facing a life sentence, Clary has completed more than twenty vocational, life-skills, and personal-development programs. [Dkt. 114 at 7; App'x at 3–26]. For example, Clary earned his GED while in custody and completed a Department of Labor, Quality Control Apprenticeship which required four-thousand hours of training. [Donson Decl. ¶ 12, App'x at 61–62]. Clary is participating in a BOP-operated reentry program that prepares inmates for release with professional and life skills training. [Donson Decl. ¶ 17, App'x at 62].

Clary has also been employed since he began his prison term. [Donson Decl. ¶ 16, App'x at 62]. Most of Clary's work has been with Federal Prison Industries ("UNICOR"), "which is an

3

assignment that emulates a community factory work setting." [Donson Decl ¶ 16, App'x at 62]. Inmates for UNICOR are "carefully selected from a waiting list and held to a higher standard of conduct and work performance." [Donson Decl ¶ 16, App'x at 62]. Clary has also worked as a tutor since 2016. [Dkt. 114 at 7; App'x at 29–31]. Tutors are also "carefully selected because they must have the personal communication skills to work directly with other inmates of diverse backgrounds and education levels." [Donson Decl. ¶ 16, App'x at 62]. Beyond helping Clary to develop practical skills, these jobs have allowed Clary to make restitution payments and send money to his children. [App'x at 1, 111].

Clary has also maintained a record of good behavior while in custody. Clary had one infraction in 1998 for being "insolent to a staff member" but has not been subject to discipline since then. [Dkt. 122 at 3]. Clary avoided discipline even though the facilities where Clary has resided were subject to numerous shutdowns for violence and inmate refusal to comply with staff orders. [*See* App'x at 34–54]. Because of his good behavior, the Bureau of Prisons ("BOP") has moved Clary from high-security facilities. [Dkt. 114 at 7–8].

Clary has offered evidence that his work and educational efforts have helped him to understand and regret his crimes and develop a newfound appreciation for life. Clary writes:

> While in prison I focused on learning why I had behaved like I did. I participated in any programs that help me identifying what might be an evil or horrible decision and turned them into rational decision. I have educated myself through the help of others in various ways. I love learning and appreciate my life and the life of others.

[App'x at 77]. Badia Henderson, the mother of one of Clary's children agrees, writing that she "believe[s] he has grown wiser and genially [sic] regrets his decision…. I am convinced he fully understands what he did to violate the law and is truly remorseful for his actions. I do believe that he is committed to make up for his mistakes and give back to society." [Henderson Ltr.,

4

App'x at 112].

Jack Donson, a former BOP employee and current federal prison consultant, summarized Clary's progress as follows:

> Mr. Clary has had exemplary behavior and programming during incarceration. He has taken advantage of the available programs to assist in re-entry despite serving a [l]ife sentence which began in the high-security, penitentiary environment. Staff have identified his ability to function in a lesser security environment and accordingly waived his public safety factor. [H]e presents a minimum risk of violent recidivism. It is my professional opinion; he has prepared himself for successful re-entry should the court be inclined to grant his petition.

[Donson Decl. ¶ 18, App'x at 62].

Since 2012, Clary has endured at least twenty-one lockdown periods where Clary and other inmates were unable to leave their cells. [Dkt. 114 at 8]. Since 2020, the COVID-19 pandemic has caused prolonged lockdowns. [Dkt. 114 at 8]. Clary contracted and recovered from COVID-19 "without significant consequence," [Dkt. 122 at 16], and is vaccinated against the COVID-19 virus. [Dkt. 114 at 8]. Clary also represents that he "suffered asbestos exposure" while previously housed at USP Lewisburg, "a fire breaking out, the water system shutting down for a week, pipes bursting, and an ongoing threat of carbon monoxide exposure." [Dkt. 114 at 8].

### d. Request for Compassionate Release

Clary represents that, on June 6, 2020, he submitted a request for compassionate release from custody to the warden at FCI McDowell. [Dkt. 114 at 9]. The warden denied the request on or around July 29, 2020, and denied Clary's subsequent appeal of this denial on or around September 10, 2020. [Dkt. 114 at 10–11].

Clary now moves under the First Step Act of 2018, Pub. L. No. 115-391, § 603(b), 132

5

Stat. 5194, 5239, for compassionate release from custody. Clary argues that four factors combine to present "extraordinary and compelling" reasons for his early release from custody: (1) his "profound rehabilitation" while in custody; (2) his "unforeseeably arduous incarceration" due to the COVID-19 pandemic, frequent shutdowns, and hazardous prison conditions; (3) his young age at the time of his offense; and (4) medical conditions that place him at a heightened risk for complications from the COVID-19 pandemic. [Dkt. 114 at 11].

## II. Legal Standard

"Once a term of imprisonment has been imposed, the Court may modify it only under very limited circumstances." *United States v. Johnson*, No. CR 18-578-01 (KM), 2022 WL 901468, at *1 (D.N.J. Mar. 28, 2022) (citing *In re Morris*, 345 F. App'x 796, 797–98 (3d Cir. 2009)). Under 18 U.S.C. § 3582(c), as modified by the First Step Act, inmates may petition federal courts directly for compassionate release from custody. *United States v. Andrews*, 12 F.4th 255, 258 (3d Cir. 2021), *cert. denied*, 142 S. Ct. 1446, 212 L. Ed. 2d 541 (2022). Relevant here, § 3582(c)(1) provides as follows:

> (A) the court, upon motion of the Director of the Bureau of Prisons, or upon motion of the defendant after the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier, may reduce the term of imprisonment (and may impose a term of probation or supervised release with or without conditions that does not exceed the unserved portion of the original term of imprisonment), after considering the factors set forth in section 3553(a) to the extent that they are applicable, if it finds that--
> > (i) extraordinary and compelling reasons warrant such a reduction; [...]
>
> and that such a reduction is consistent with applicable policy statements issued by the Sentencing Commission....

18 U.S.C § 3582(c); *United States v. Johnson*, No. CR 18-578-01 (KM), 2022 WL 901468, at

*1–2 (D.N.J. Mar. 28, 2022).

The statute permits compassionate release "if (1) extraordinary and compelling reasons permit the requested reduction in sentence; (2) the reduction is consistent with applicable policy statements by the U.S. Sentencing Commission; and (3) consideration of the applicable sentencing factors in 18 U.S.C. § 3553(a) supports the relief sought." *United States v. Moe*, No. CR 17-277 (KSH), 2021 WL 5277202, at *2 (D.N.J. Nov. 12, 2021), *appeal dismissed sub nom. USA v. Moe*, No. 21-3289, 2022 WL 2128568 (3d Cir. Mar. 21, 2022) (citing 18 U.S.C. § 3582(c)(1)(A)).  To determine what constitutes "extraordinary and compelling reasons" for early release, courts typically refer to the Sentencing Commission's policy statement, U.S.S.G. § 1B1.13 (the "Policy Statement").  *See Andrews*, 12 F.4th 255 at 259–60 (holding that district courts may refer to the Policy Statement to determine whether extraordinary and compelling reasons for release exist, even though the Policy Statement is not binding on district courts).  The Policy Statement provides that, so long as an inmate "is not a danger to the safety of any other person or to the community, as provided in 18 U.S.C. § 3142(g),

> extraordinary and compelling reasons exist under any of the circumstances set forth below:
>
> (A) Medical Condition of the Defendant.—
>
>> (i) The defendant is suffering from a terminal illness (i.e., a serious and advanced illness with an end of life trajectory). A specific prognosis of life expectancy (i.e., a probability of death within a specific time period) is not required. Examples include metastatic solid-tumor cancer, amyotrophic lateral sclerosis (ALS), end-stage organ disease, and advanced dementia.
>>
>> (ii) The defendant is—
>>
>>> (I) suffering from a serious physical or medical condition,

7

>> (II) suffering from a serious functional or cognitive impairment, or
>
>> (III) experiencing deteriorating physical or mental health because of the aging process,
>
> that substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility and from which he or she is not expected to recover.
>
> (B) Age of the Defendant.—The defendant (i) is at least 65 years old; (ii) is experiencing a serious deterioration in physical or mental health because of the aging process; and (iii) has served at least 10 years or 75 percent of his or her term of imprisonment, whichever is less.
>
> (C) Family Circumstances.—
>
>> (i) The death or incapacitation of the caregiver of the defendant's minor child or minor children.
>
>> (ii) The incapacitation of the defendant's spouse or registered partner when the defendant would be the only available caregiver for the spouse or registered partner.
>
> (D) Other Reasons.—As determined by the Director of the Bureau of Prisons, there exists in the defendant's case an extraordinary and compelling reason other than, or in combination with, the reasons described in subdivisions (A) through (C).

U.S.S.G. § 1B1.13 cmt. 1.

Before petitioning a court for early release, inmates must first exhaust administrative remedies. To do so, inmates "must at least ask the Bureau of Prisons (BOP) to [petition the sentencing court for early release] on their behalf and give BOP thirty days to respond." *United States v. Raia*, 954 F.3d 594, 595 (3d Cir. 2020) (citing 18 U.S.C. § 3582(c)(1)(A)).

### III. Analysis

There is no dispute that Clary exhausted administrative remedies by petitioning the warden at FCI McDowell for early release, appealing the warden's denial of that petition, and

waiting more than thirty days before filing the present motion. [*See* Dkt. 122 at 3 (conceding that Clary exhausted his administrative rights)]. Thus, Clary's motion is properly before the Court.

Clary contends that four factors collectively present "extraordinary and compelling" reasons for his early release from custody: (1) his "profound rehabilitation" while in custody; (2) his "unforeseeably arduous incarceration" due to lockdowns, the COVID-19 pandemic, and health hazards in federal facilities; (3) his young age at the time of his offense; and (4) medical conditions that place him at a heightened risk for complications from the COVID-19 pandemic. [Dkt. 114 at 11]. The Court will address these arguments individually and collectively.

    a. **Rehabilitation**

Clary first argues that his rehabilitation during his twenty-three years in prison justify release. Clary's rehabilitation argument relies on *United States v. Herrera-Genao*, No. CR 07-454, 2021 WL 2451820 (D.N.J. June 16, 2021), where Judge Thompson granted a compassionate release request from an inmate who served twenty-two years of a 117-year sentence for multiple armed bank robbery and conspiracy charges. Judge Thompson found that the defendant's efforts to "develop as a person" despite his 117-year sentence supported compassionate release. *Id.* \*7. The defendant developed remorse, empathy, and the ability to avoid conflict while in prison, and went eleven years without a disciplinary infraction. *Id.* \*7. The defendant also enrolled in educational programs and worked in food service. *Id.* \*7. The defendant's sister wrote a letter indicating that the defendant "went in [to prison] a hot headed, impulsive, and reckless 22 year old boy and has blossomed into a respectful, kind, and peaceful 36 year old man." *Id.* \*7. Judge Thompson concluded that the defendant's rehabilitation, among other factors, justified early release.

Clary argues that his rehabilitation mirrors or exceeds that of the defendant in *Herrera-Genao*. Clary has not received a reprimand in approximately twenty-four years, more than twice the time of the defendant in *Herrera-Genao*. Because of his "exemplary conduct" and the trust that he has earned from the BOP, he has been relocated from maximum security facilities to medium security. [Dkt. 114 at 13]. Clary also points to his extensive participation in educational programming and his work as a tutor as further evidence of his rehabilitation. [Dkt. 114 at 13]. Clary submitted a letter along with this motion demonstrating his remorse for his consequences. [App'x at 77]. Clary also cites Jack Donson's affidavit, which opines that Clary is fit for early release because of his rehabilitation and efforts to prepare himself for a life outside of prison. [Donson Decl. ¶¶ 11–16, App'x at 60–62].

Clary's good behavior, work ethic, and skill-building are commendable and compelling. But as the Government points out, "[r]ehabilitation of the defendant alone shall not be considered an extraordinary and compelling reason" under federal statute. 28 U.S.C. § 994(t); *United States v. Garris*, No. CR 15-229, 2022 WL 102258, at *4 (D.N.J. Jan. 11, 2022) ("[A] defendant's rehabilitation may only 'contribute to extraordinary and compelling reasons.'" (quoting *United States v. McNair*, 481 F. Supp. 3d 362, 369–70 (D.N.J. 2020))). Thus, the Court cannot grant Clary's motion for compassionate release based solely on his rehabilitation and must consider his rehabilitation in conjunction with his other arguments for early release.

### b. Arduous Incarceration

Clary claims that numerous safety hazards and frequent shutdowns have made his prison term uniquely burdensome. [Dkt. 114 at 15–16]. For example, he claims that he was exposed to asbestos while housed at USB Lewisburg and was trapped while a "large-scale fire" broke out in the facility. [Dkt. 114 at 17]. Clary also went without running water for one week while at

10

Lewisburg. [Dkt. 114 at 17]. Clary also claims that other inmates at FCI McDowell have been poisoned by carbon monoxide, and that he suffers anxiety over the prospect of carbon monoxide poisoning. [Dkt. 114 at 17–18].

Clary further argues that more recently, the COVID-19 pandemic has ushered in a new era of hardship. Clary became infected with the COVID-19 virus, and the infection "rendered him bedridden and delirious for nearly two weeks." [Dkt. 114 at 17]. Repeated COVID-19 lockdowns in prison also "robbed Mr. Clary of access to family, to counsel, and to therapeutic and recreational programs." [*Id.*]. Clary contends that the "pandemic has spawned conditions of confinement far more punishing than what could have been expected at the time of Clary's sentencing." [Dkt. 114 at 17]. Clary cites to cases where district courts outside of this circuit have granted early release and imposed lesser sentences because of COVID-19 restrictions in federal prisons. *E.g. United States v. Rengifo*, 569 F. Supp. 3d 180, 197 (S.D.N.Y. 2021) ("The unanticipated severity of those lockdown conditions constitutes another circumstance that, in combination with the other factors discussed above, collectively amounts to an extraordinary and compelling reason for early release."); *United States v. Marmolejos*, No. 19 CR. 626 (PAE), 2021 WL 807128, at *4 (S.D.N.Y. Mar. 3, 2021) (observing that the court imposed a sentence "farther below the guidelines sentence than it otherwise would have been on account of the conditions" in the prison due to COVID-19). Based on the COVID-related restrictions imposed upon him, Clary urges the Court to follow suit.

The Government responds that these hardships do not justify early release. [Dkt. 122 at 19]. The Government argues that COVID-19-related hardships are not "extraordinary and compelling" reasons for release because these same hardships affect "other inmates or entire prison populations." [Dkt. 122 at 19]; *see also United States v. Garrett*, No. CR 18-125 (WJM),

2022 WL 1617679, at *2 (D.N.J. May 23, 2022) (noting that restrictions in federal prisons are meant to protect inmates and, that "if a correctional institution's safety measures alone justified an inmate's release and reduction of sentence, every federal inmate could raise these claims."); *United States v. Everett*, No. 2:12-CR-162, 2021 WL 322182, at *2 (W.D. Pa. Feb. 1, 2021) ("'[E]very prisoner in the facility and other BOP facilities is subject to [ ] similar conditions brought about by the COVID-19 pandemic,' and [defendant] 'has not explained why he should be given special or unique treatment.'" (quoting *United States v. Lischewski*, No. 18-00203, 2020 WL 6562311, at *2 (N.D. Cal. Nov. 9, 2020))).

      The Court agrees with the Government. While the Court accepts that COVID-related shutdowns have created unforeseen hardships in federal prisons, these hardships are not so extraordinary and compelling that they justify reducing a life sentence to twenty-three years. *See United States v. Wright*, 569 F. Supp. 3d 158, 162 (W.D.N.Y. 2021) (finding that COVID-related lockdowns did not constitute an extraordinary and compelling reason for release). Moreover, inmates nationwide have had to endure these difficulties, and the court cannot release every inmate who has been subject to COVID-related lockdowns. *See United States v. Hudson*, No. CR 10-329, 2021 WL 2912012, at *4 (E.D. La. July 12, 2021) (finding that COVID-related lockdowns are not "extraordinary" because they "are applicable to all inmates who are currently imprisoned and hence are not unique to any one person." (quoting *United States v. Koons*, 455 F. Supp. 3d 285, 291 (W.D. La. 2020))); *United States v. Wright*, No. CR-16-214-04, 2020 WL 1976828, at *5 (W.D. La. Apr. 24, 2020) ("The Court cannot release every prisoner at risk of contracting COVID-19 because the Court would then be obligated to release every prisoner.") (footnote omitted). While the court understands that Clary contracted COVID-19, the illness that he suffered does not constitute an extraordinary and compelling reason for release, particularly

where approximately ninety million people have contracted the virus nationwide.  *See* Center for Disease Control, *COVID DATA TRACKER WEEKLY REVIEW* (updated July 22, 2022), https://www.cdc.gov/coronavirus/2019-ncov/covid-data/covidview/index.html; *United States v. Champion*, No. 1:13-CR-25(4), 2022 WL 769870, at *3 (S.D. Ohio Mar. 14, 2022) ("Prisoners who have contracted COVID-19 and recovered ordinarily cannot rely on COVID-19 to establish an extraordinary and compelling basis for compassionate release." (collecting cases)).  While the Court is sympathetic to the difficulties occasioned non-covid-related lockdowns, poor prison conditions, and a fear of carbon monoxide poisoning, those conditions are transitory and do not present extraordinary and compelling reasons for early release.

In sum, the court is sympathetic to the hardships that Clary has endured during his time in prison but finds that they do not amount to an extraordinary and compelling basis for early release from custody.

### c. Medical Conditions and COVID-19

Finally, Clary argues that his health conditions coupled with the risk of COVID-19 illness justify early release from prison.  [Dkt. 114 at 22–23].  "Courts evaluating requests for early release due to COVID-19 consider whether a defendant's individual health characteristics and the risk of contracting COVID-19, taken together, present an extraordinary and compelling reason for reducing the defendant's sentence." *United States v. Day*, No. CR 17-00474, 2021 WL 2660202, at *2 (D.N.J. June 29, 2021) (citing *United States v. Hynes*, No. 3:18-CR-00222, 2020 WL 6060984, at *3 (D.N.J. Oct. 14, 2020).  Courts "around the country have [only] granted compassionate release where the defendant suffers from a serious condition that increases the likelihood of severe consequences from COVID-19." *United States v. Tartaglione*, No. CR 15-491, 2020 WL 3969778, at *5 (E.D. Pa. July 14, 2020) (quoting *United States v. Somerville*, No.

13

12-225, 2020 WL 2781585, at *7, 2020 U.S. Dist. LEXIS 93935, at *18 (W.D. Pa May 29, 2020)). Courts look to guidance from the Centers for Disease Control ("CDC") to determine whether an inmate presents a serious medical condition. *United States v. Catanzarite*, No. CR 18-0362 (ES), 2020 WL 2786927, at *4 (D.N.J. May 29, 2020); *see also People with Certain Medical Conditions*, CDC, https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html (last visited July 22, 2022) (listing medical conditions that present increased risk of severe illness from COVID-19) ("CDC Medical Conditions" hereinafter).

Here, Clary argues that scar tissue on his lungs from when his brother stabbed him in the chest as well as his increased risk of cancer from asbestos exposure make him more likely to become seriously ill from COVID-19. [Dkt. 114 at 22–23]. The CDC recognizes lung scar tissue as a risk factor but does not list exposure to asbestos or the risk of cancer as a risk factor. *See* CDC Medical Conditions, *supra*. Moreover, as the Government points out, Clary has not provided any evidence or medical records to support either condition. *United States v. Zamor*, 460 F. Supp. 3d 1314, 1317 (S.D. Fla. 2020) ("[W]ithout any information, detail, or evidence of a severe medical condition that places him at a high risk of contracting a severe case of Covid-19, [defendant] cannot show that extraordinary and compelling reasons support his release….").

Even if Clary provided evidence to substantiate his heightened risk for severe COVID-19 illness, Clary has received COVID-19 vaccines which mitigate that risk. *United States v. Roper*, 2021 WL 963583, at *4 (E.D. Pa. Mar. 15, 2021) (finding that the "risk posed to an inoculated [inmate] is not an extraordinary and compelling reason for his release."); *United States v. Burney*, No. 1:18-CR-606, 2021 WL 4963253, at *7 (D.N.J. Oct. 25, 2021); *United States v. Ulmer*, No. 18-00579-3, 2021 WL 844579 (E.D. Pa. Mar. 5, 2021) (citing vaccination as a basis

for denying compassionate release). Given his vaccination status, COVID-19 does not present an extraordinary and compelling reason for release even with Clary's alleged lung injuries.

### d. Age

Clary next argues that his upbringing and young age at the time of his armed robbery favors early release. [Dkt. 118 at 18]. Clary does not dispute that the Court considered Clary's age when sentencing Clary in 1999, but argues his traumatic childhood experiences hindered his ability to fully appreciate his conduct. [Dkt. 114 at 18]. Clary recites numerous examples of the horrific conditions that Clary endured during his youth and adolescence. [Dkt. 114 at 21–22]. Clary points to the expert report of Dr. James Garbarino, a consultant on issues of child and adolescent development, who opines that Clary's "litany of unrelenting childhood suffering" likely disrupted Clary's brain development and impulse control. [Dkt. 118 at 21–22; App'x at 72]. While in custody, Clary "has embraced counselling and sought assistance to understand and overcome his mental health and developmental issues." [Dkt. 114 at 22].

Clary further argues that scientific developments since Clary's sentencing have allowed us to "understand that one's capacity for independent decision making is substantially impaired during adolescence." [Dkt. 114 at 18]. Clary includes a report from James Gambarino, a consultant in child and adolescent development, who opines executive control in the brain continues to develop into an individual's twenties. [Gambrino Rep't, App'x at 64-68]. Gambrino also opines that Clary's unstable and traumatic upbringing may have hindered his maturation and development, and that this developmental delay likely contributed to his misconduct. [Gambrino Rep't, App'x at 69-79]. Clary points out that the Supreme Court, in its Eighth Amendment jurisprudence, has decided that "youth matters in sentencing," *Jones v. Mississippi*, 141 S.Ct. 1307, 1314 (2021), and that "the distinctive attributes of youth …

15

diminish the penological justifications" at sentencing. *Miller v. Alabama*, 567 U.S. 460, 472 (2012).

In opposition, the Government contends that the Court already considered Clary's age and upbringing when sentencing Clary to life in prison and cannot reconsider those same factors now. [Dkt. 122 at 18–19]. The Government cites *United States v. Hunter*, where the Sixth Circuit concluded 18 U.S.C. § 3528(c)(1)(A) "precludes a court from simply taking facts that existed at sentencing and repackaging them as 'extraordinary and compelling.'" *United States v. Hunter*, 12 F.4th 555, 569 (6th Cir. 2021), *cert. denied*, 142 S. Ct. 2771 (2022); *see also United States v. Rene*, No. 22-1642, 2022 WL 1793023, at *1 (3d Cir. June 2, 2022) (citing *Hunter* to uphold a district court's decision not to treat facts known at sentencing as extraordinary and compelling reasons for relief); *United States v. Womble*, No. CR 13-507 (NLH), 2022 WL 1500957, at *2 (D.N.J. May 11, 2022) (Hillman, J.) (same).

Clary replies that the Government "misses the point" in advancing this argument. Clary submits that he is not asking the Court to consider the mere fact of his age at the time of the original sentencing, but rather to consider the fact of his age at the time in the context of the subsequent growth in understanding the differences between the brains of adolescents and emerging adults and those of mature adults in terms of judgment and behavior. In support of this position, Clary cites to *United States v. Rengifo* in which the Court found extraordinary and compelling reasons based on the combination of four distinct factors. *United States v. Rengifo*, 2021 WL 5027334, at *14 (S.D.N.Y. Oct. 29, 2021) (listing a change in Colombian law, the defendant's youth and rehabilitation alongside considerations of cognitive science, his family circumstances, and conditions of confinement as the four factors justifying release).

Even taking into account Clary's age at the time of the original sentencing in the context

16

of changes in understanding between the brains of adolescents and emerging adults and those of mature adults in terms of judgment and behavior, the Court finds that he fails to show that the combination of these issues and other issues addressed herein constitutes extraordinary and compelling reasons for release. Viewing Clary's request for release through this lens, the circumstances still do not render the sentence served by Clary materially different from the one envisioned by the Court. Thus, Clary's arguments do not present an extraordinary and compelling reasons basis for early release.

### e. Conclusion Regarding Extraordinary and Compelling Reasons for Release

To synthesize the above discussion, the Court finds that Clary's rehabilitation story to be praiseworthy and compelling. But federal statute precludes the Court from granting compassionate release based only on Clary's rehabilitation. *See* 28 U.S.C. § 994(t). Clary's alternative arguments fail to present extraordinary and compelling reasons on their own and when coupled with Clary's rehabilitation claims. At this juncture, the Court therefore concludes that Clary has not presented extraordinary and compelling reasons for early release.

### f. The 18 U.S.C. § 3553(a) Sentencing Factors

Even if Clary "presented extraordinary and compelling circumstances for compassionate release, 'a court may deny the requested relief if the 18 U.S.C. § 3553(a) factors do not weigh in favor of the defendant's release." *United States v. Wise*, No. CR 16-00576, 2021 WL 2660258, at *3 (D.N.J. June 29, 2021) (quoting *United States v. Adams*, No. 3:00-CR-00697, 2020 WL 6063055, at *5 (D.N.J. Oct. 14, 2020)). Those factors include

> (1) the nature and circumstances of the offense and the history and characteristics of the defendant;
>
> (2) the need for the sentence imposed

17

> (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
> (B) to afford adequate deterrence to criminal conduct;
> (C) to protect the public from further crimes of the defendant; and
> (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.

18 U.S.C. § 3553(a). These factors weigh against early release at this juncture.

With respect to factors (1) and (2)(A) and (B), there is no doubt that Clary's participation in an armed robbery that left two people dead and another critically injured is a serious crime that warrants a significant sentence to provide just punishment, promote respect for the law, and deter others. Indeed, Clary's conduct included five death-eligible offenses, [Dkt. 122 at 2–3], and Clary pled guilty in exchange for an agreement from the Government not to pursue the death penalty. [*Id.*]; *United States v. Jones*, No. 01-80571, 2022 WL 1487740, at *5 (E.D. Mich. May 11, 2022) ("[A] prison term of twenty-two years does not on its face appear proportionate to the seriousness of [the defendant's] offenses … especially in light of the fact that his crimes rendered him eligible for the death penalty" (quoting *United States v. Dale*, No. 92-81127, 2022 WL 163612, at *7 (E.D. Mich. Jan. 18, 2022))); *United States v. Cable*, No. 3:96-CR-00004, 2021 WL 5882659, at *4 (M.D. Tenn. Dec. 13, 2021) (denying compassionate release motion by death-eligible defendant sentenced to life in prison); *but see United States v. Ramirez*, 571 F. Supp. 3d 40, 52 (S.D.N.Y. 2021) (reducing death-eligible defendant's forty-eight year sentence by eight years because of his rehabilitation, age at the time of sentencing, and traumatic upbringing). Courts routinely find that these factors weigh against early release. *See, e.g.*, *United States v. Darby*, No. CR 13-631 (KM), 2022 WL 1423089, at *7–8 (D.N.J. May 5, 2022); *United States v. Edmonds*, No. CR 18-364 (RMB), 2021 WL 1561848, at *2 (D.N.J. Apr. 21,

18

2021); *United States v. Berry*, No. CR 10-051-1 (NLH), 2020 WL 4035457, at *3 (D.N.J. July 17, 2020) ("Defendant's background includes the commission of multiple armed robberies, including one in which a[] victim was shot during the course of the robbery. These are serious crimes that should give any court pause in considering early release."). These factors militate strongly against early release.

The Court is persuaded that factor (D) weighs in Clary's favor. As discussed above, Clary has committed himself to self-improvement and rehabilitation since he was incarcerated. He has avoided discipline by maintaining good behavior, and has taken advantage of more than twenty educational programs. Clary earned his GED while in custody and completed an apprenticeship that required four-thousand hours of training. [Donson Decl. ¶ 12, App'x at 61]. Further, Clary completed a cognitive behavioral program that has helped hm to "adopt[] a pro-social lifestyle." [Donson Decl. ¶ 15, App'x at 61–62]. Clary has also "maintained a job since his incarceration," including tutor and UNICOR programs for which he was "carefully selected." [Donson Decl. ¶ 16, App'x at 62]. Clary has demonstrated financial responsibility by making regular restitution payments and sending money to his children. [App'x at 1, 111].

Likewise, with respect to Factor (C), Clary presents substantial evidence that his rehabilitation efforts have prepared him for a life outside of federal custody. Jack Donson, a "federal prison consultant," screened Clary for his risk of recidivism based on his attempts at "escape," "violence, incident reports, and criminal history score." [Donson Decl. ¶ 11, App'x at 60]. Donson concluded that Clary's risk for recidivism is "minimum," which is the lowest score. [*Id.*]. Further, participants in the UNICOR program for which Clary has worked are "24% less likely to recidivate after prison and 14% more likely to find and maintain employment." [Donson Decl. ¶ 16, App'x at 62]. Clary is also participating in a BOP-operated reentry program

that prepares inmates for release with professional and life skills training. [Donson Decl. ¶ 17, App'x at 62]. Clary's persistent efforts to prepare himself for the challenges of life outside are commendable and suggest that he would succeed.

Despite Clary's commendable efforts to improve himself while in prison, the Court simply does not believe that reducing Clary's life sentence to a twenty-three-year sentence would adequately reflect the seriousness of his crimes. For that reason, the Court concludes that the § 3553(a) factors weigh against granting Clary's motion, even if he established extraordinary and compelling grounds for yearly release.

**IV.    Conclusion**

For the reasons set forth herein, the Court will deny Defendant Clary's Motion for Compassionate Release [Dkt. 114]. An appropriate order will follow.


November 29, 2022                                             /s/ Joseph H. Rodriguez
                                                              Hon. Joseph H. Rodriguez, USDJ